IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

STEVEN TARNOVSKY,                                    05-CV-1811-BR

        Plaintiff,                              OPINION AND ORDER

v.

ADIDAS AMERICA, INC.,

        Defendant.


**RICHARD C. BUSSE**
Busse & Hunt
621 S.W. Morrison Street
Suite 521
Portland, OR 97205
(503) 248-0504

        Attorneys for Plaintiff

**KATHLEEN R. DENT**
**JENNA LEIGH MOONEY**
Davis Wright Tremaine LLP
1300 S.W. Fifth Avenue
Suite 2300
Portland, OR 97201-5630
(503) 241-2300

        Attorneys for Defendant


1 - OPINION AND ORDER

**BROWN, Judge.**

This matter comes before the Court on Defendant's Motion for Summary Judgment (#43).

The Court heard oral argument on October 26, 2006, and took Defendant's Motion under advisement at that time.  For the reasons that follow, the Court **DENIES** Defendant's Motion as to Plaintiff's Claim One and **GRANTS** Defendant's Motion as to Plaintiff's Claims Two, Three, and Four.


## BACKGROUND

The following facts are undisputed unless otherwise noted and are stated in the light most favorable to Plaintiff:

Plaintiff worked for Defendant from April 2000 until his termination in August 2005.  Plaintiff was a tax-compliance manager for the majority of that time and an at-will employee at all times.

Plaintiff alleges his relationship with Charles Carvell, his immediate supervisor and friend, began to deteriorate in 2002.  During that year, Plaintiff came to believe that Defendant was not fully meeting its tax obligations and was operating inefficiently and ineffectively due in part to Carvell's management.  Plaintiff brought these concerns to the attention of Brandt Schmidtmann, Defendant's Chief Financial Officer and

Carvell's supervisor.  Plaintiff believes his statements to Schmidtmann "tainted" his relationship with Carvell from that point forward.  Carvell testified at deposition that Plaintiff's statements to Schmidtmann upset Carvell and made him feel somewhat betrayed.

In March 2003, Plaintiff began a long-running series of internal complaints about Defendant's tax practices.  Plaintiff's two primary complaints were:

1) Defendant allegedly failed to report millions of dollars in sales and use-taxes to various state and local jurisdictions and

2) Defendant allegedly failed to issue 1099 tax forms to various athletes, coaches, and others to whom Defendant routinely gave out promotional merchandise as part of its normal business operations, which, in Plaintiff's opinion, violated various Internal Revenue Service (IRS) rules and regulations.

If Plaintiff correctly estimated the tax consequences of his compliance theories, his division's bottom line would have suffered a $2.3 million negative adjustment, which, in turn, would have prevented managers from receiving financial bonuses.

Plaintiff raised these concerns at nearly every weekly tax-department meeting between March 2003 and June 2005 and also complained to Carvell personally.  Indeed, Plaintiff tried but

failed to get a compliance system implemented, including a
$50,000 computerized sales-tax compliance system.  Defendant,
however, never addressed the issues to Plaintiff's satisfaction.
Plaintiff asserts Carvell's response was to stall on implementing
changes or to "sweep the issues under the rug."  In addition,
Carvell told Plaintiff to "quit beating a dead horse" and to
"pick his battles" as to the complaints he made.

As part of his job responsibilities, Plaintiff participated
in certain tax audits required by government agencies.  Plaintiff
alleges Carvell told him that he should not volunteer information
about the disputed tax practices at these audits and should
discuss these issues only if the auditors specifically asked
about them.  Plaintiff, however, was not told to lie or to
forward false information.

Plaintiff believes his complaints had an impact on his
performance ratings.  Defendant rates employee performances for
each calendar year as "fully meeting," "meets," or "not meeting"
expectations.  Carvell conducted Plaintiff's evaluations.
Plaintiff received a "fully meeting" rating in 2002 and 2003, but
he received only a "meets" rating in 2004.  Carvell stated the
drop resulted from a perceived lack of productivity by Plaintiff
and from excessive conflict in Plaintiff's interactions in the
workplace.  Carvell asserted there was conflict with Plaintiff

regarding some issue every single day.

In June 2005, Plaintiff's mother became ill during a period when Plaintiff's department faced a July 1 deadline to submit tax-return information to Defendant's external tax auditors. On June 15, 2005, Plaintiff told Carvell that he needed to take family leave to help care for and spend time with his ailing mother. Carvell told Plaintiff to take the time he needed. Plaintiff was on leave sporadically over the next few weeks. Plaintiff's "flex-time hours account," which Defendant uses to track an employee's leave time, was not reduced when Plaintiff took family leave to attend to his mother. In particular, Defendant paid Plaintiff for at least some of the hours that could have been deducted as family leave.

Even though Carvell approved Plaintiff's family leave, Plaintiff maintains Carvell stressed that Plaintiff should do everything in his power to make sure the July 1 deadline was met. Meeting the deadline was apparently a benchmark for Carvell to merit a bonus. Plaintiff testified at deposition that his department missed the July 1 deadline, and he believes his absence on family leave was the primary reason. According to Plaintiff, Carvell was upset that the deadline was missed. Plaintiff alleges Carvell stopped holding weekly tax-department meetings shortly thereafter.

August 2005 was the last month that Plaintiff worked for Defendant.  Around that time, Brandon Schmidt, Plaintiff's subordinate, received a job offer from another company, but he stayed with Defendant after receiving a thirty-percent raise. Plaintiff believed he also deserved a raise.  To support his position, he contacted Jack Cuniff, Defendant's Chief Operations Officer, to request a market survey of pay levels for Plaintiff's job.  Cuniff and Schmidtmann agreed to have the Human Resources Department conduct a survey, which ultimately showed Plaintiff's compensation was approximately $10,000 below market level. Nevertheless, Karen Mitchell, Defendant's Benefits and Compensation Director, recommended against giving Plaintiff a raise.  Although market rate was a relevant consideration, Mitchell did not think it should be the driving factor in giving an employee a substantial, mid-year pay increase.

Plaintiff received a copy of the salary survey and, as a result, requested a raise of approximately $10,000.  Before meeting with Plaintiff, Schmidtmann discussed the issue with Carvell.  Both agreed with Mitchell that Plaintiff should not get a raise and thought it was possible that Plaintiff might quit if his request was denied because compensation was one of Plaintiff's "hot button" issues.  Before addressing the requested raise with Plaintiff, Schmidtmann wrote a list of reasons for denying Plaintiff's request that included "budget,"

6 - OPINION AND ORDER

"performance," "commitment," "trust," "promotability," "market gap," and "experience."  The final item on Schmidtmann's agenda was:  "What now?  a) Give notice?  b) Decide to stay and commit to a high level of performance?"

On August 17, 2005, Plaintiff met with Schmidtmann to discuss Plaintiff's request for a raise.  Schmidtmann advised he was denying the request.  During the meeting, Plaintiff described Schmidtmann's demeanor as smug, hostile, and unresponsive. Schmidtmann asked Plaintiff how the denial would affect his future performance as Defendant's employee.  Plaintiff responded he was a professional who would do his job as always.

Plaintiff returned to his office after the meeting.  When Schmidt approached Plaintiff to ask about the meeting, Plaintiff told Schmidt about the denial, stated he "hated that motherfucker" Schmidtmann, and said he needed to leave the office before he ended up punching Schmidtmann.  Plaintiff went to Carvell's office and told him the same thing behind closed doors. Plaintiff then left work.  On his way out, he punched the wall of an elevator in anger.

After Plaintiff left, Carvell and Schmidt conferred about Plaintiff's comments.  Carvell then reported Plaintiff's statements to Schmidtmann.  Schmidtmann contacted the Human Resources Department and Arden True-Owens, Director of Employee Relations, who initiated an investigation.

7 - OPINION AND ORDER

Plaintiff returned to work on August 18, 2005.  Human Resources employee Dana Cromwell interviewed Plaintiff in the early afternoon about the events of the previous day.  Plaintiff did not deny his comments about Schmidtmann or the fact that he punched the elevator wall.  At Cromwell's suggestion, Plaintiff went home after the interview.  Cromwell later called Plaintiff and told him not to come in the next day.

After Defendant concluded its investigation, Schmidtmann, Cromwell, and Cuniff decided to terminate Plaintiff's employment.  Carvell agreed with the decision.  Defendant formally terminated Plaintiff on August 23, 2005.

On December 1, 2005, Plaintiff filed this action.  On July 31, 2006, Defendant moved for summary judgment as to all of Plaintiff's claims.

## STANDARDS

Fed. R. Civ. P. 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  The moving party must show the absence of an issue of material fact.  *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002).  In response to a properly supported motion for summary judgment, the nonmoving party must go beyond the pleadings and show there is a

genuine issue of material fact for trial.  *Id*.

An issue of fact is genuine "'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  The court must draw all reasonable inferences in favor of the nonmoving party.  *Id*.  "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Easter v. Am. W. Fin.* 381 F.3d 948 (9th Cir. 2004)(citing *Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters Local Union No. 1936,* 680 F.2d 594, 598 (9th Cir. 1982)).

A mere disagreement about a material issue of fact, however, does not preclude summary judgment. *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1389 (9th Cir. 1990).  When the nonmoving party's claims are factually implausible, that party must come forward with more persuasive evidence than otherwise would be required. *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1147 (9th Cir. 1998)(citation omitted).

The substantive law governing a claim or a defense determines whether a fact is material. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).  If the resolution of a factual dispute would not affect the outcome of the claim, the

court may grant summary judgment. *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir. 2001).


## DISCUSSION

In his Complaint, Plaintiff asserts four claims:

Claim One - Wrongful discharge for good-faith opposition to Defendant's tax practices in violation of Oregon common law;

Claim Two - Wrongful discharge in retaliation for taking protected family leave in violation of Oregon common law;

Claim Three - Unlawful retaliation for taking protected family leave in violation of the Family Medical Leave Act (FMLA), 29 U.S.C. § 2601, *et seq.*; and

Claim Four - Unlawful retaliation for taking protected family leave in violation of the Oregon Family Leave Act (OFLA), Or. Rev. Stat. § 659A.112, *et seq.*

**1.    Claim One:  Common Law Wrongful Discharge Based on Plaintiff's Objections to Defendant's Tax Practices.**

In Claim One, Plaintiff alleges he was wrongfully discharged for resisting Defendant's allegedly illegal tax practices.  To state a wrongful-discharge claim under Oregon common law, "there must be a discharge, and that discharge must be wrongful." *McGanty v. Staudenraus*, 321 Or. 532, 551 (1995)(internal quotation omitted).  Because Plaintiff's termination is

10 - OPINION AND ORDER

undisputed, analysis of that element is unnecessary.

**A.    Tort of Wrongful Discharge Generally.**

Under Oregon common law, an employer may discharge an employee at any time for any reason unless doing so violates a contractual, statutory, or constitutional requirement. *Patton v. J. C. Penney Co.*, 301 Or. 117, 120 (1986).  The tort of wrongful discharge is a narrow exception to this general rule. *See Sheets v. Knight*, 308 Or. 220, 230-31 (1989).  Oregon courts have recognized two circumstances that give rise to this tort: 1) discharge for performing a public duty or fulfilling a societal obligation and 2) discharge for exercising an important job-related right.  Examples of the first category include discharge for serving on jury duty, *Nees v. Hock*, 272 Or. 210 (1975); for reporting patient abuse at a nursing home, *McQuary v. Bel Air Convalescent Home, Inc.*, 69 Or. App. 107 (1984); and for refusing to sign a false and potentially defamatory statement about a coworker, *Delaney v. Taco Time International*, 297 Or. 10 (1984).  Examples of the second category include discharge for resisting sexual harassment by a supervisor, *Holien v. Sears, Roebuck and Co.*, 298 Or. 76 (1984), and for filing a workers' compensation claim, *Brown v. Transcon Lines*, 284 Or. 597 (1978).

Plaintiff primarily argues his discharge fits within the second exception because he allegedly was discharged for

exercising important job-related rights.  The cases in which
Oregon courts have found an employee's termination gave rise to
the tort of wrongful discharged under the job-related right
exception have characterized the right as a personal one that an
employee enjoys as a matter of public policy.  A classic example
is the right to workers' compensation benefits.  *Brown v. Bd. of
Educ.*, 207 Or. App. 163, 169 (2006)(citing *Brown v. Transcon
Lines*, 284 Or. 597 (1978)).  To date, the Oregon courts have not
suggested they would view an employee's objections to his
employer's illegal tax practices as a personal right equivalent
to resisting sexual harassment by a supervisor or to filing a
workers' compensation claim, and the Court does not anticipate
the Oregon Supreme Court will do so.  *See S.D. Myers, Inc. v.
City and County of San Francisco*, 253 F.3d 461, 473 (9th Cir.
2001)(When the Oregon Supreme Court has not ruled on an issue of
state law, this Court must predict how the Oregon Supreme Court
would decide the issue).  This Court, therefore, concludes this
exception does not apply to Plaintiff's Claim One for wrongful
discharge.

Plaintiff also argues his termination falls within the
public-duty or societal-obligation exception.  In response,
Defendant contends that Plaintiff does not identify sufficient
authority establishing the requisite duty or obligation to oppose

Defendant's tax accounting practices.  Defendant relies on *Babick v. Oregon Arena Corp.*, 333 Or. 401 (2002).

In *Babick*, the plaintiffs were security guards who were fired after they arrested concert-goers at a facility where the plaintiffs were working.  The plaintiffs argued, among other things, that Oregon statutes reflected a "general public policy in favor of an orderly and safe community." *Id.* at 408 (internal citations omitted).  Thus, the plaintiffs argued their conduct in arresting disorderly concert patrons supported the plaintiffs' wrongful-discharge claim under the public-duty exception.  The Oregon Supreme Court, however, did not find the statutes cited by the plaintiffs supported their alleged public duty. *Id.* at 410. The court noted the public-duty or societal-obligation exception requires a court to "find a public duty, not create one, using constitutional and statutory provisions, or the case law." *Id.* at 407-08.  Here Defendant contends Plaintiff's wrongful-discharge claim under the public-duty exception fails because Plaintiff cannot identify a statute or constitutional provision that affirmatively mandated his actions as public duties.

The *Babick* holding, however, is not as narrow as Defendant suggests.  The Oregon Supreme Court specifically declined to hold as a matter of Oregon law that a "[public] duty exists only if some statute or other source of law imposes a specific legal obligation on the employee to act in a way that precipitates the

13 - OPINION AND ORDER

discharge." *Id.* at 409.  Plaintiff's contention that he was acting pursuant to a public duty or societal obligation, therefore, is not foreclosed by *Babick*.

In fact, the Oregon Supreme Court strongly suggests in *Delaney v. Taco Time International* that an employee is performing a public duty or fulfilling a societal obligation by actively complaining about and resisting illegal practices and trying to bring them to an end.  297 Or. at 16 (employee fired for refusing to sign a false, arguably defamatory statement was fulfilling a societal obligation and, therefore, satisfactorily stated a claim for wrongful discharge).  Moreover, opinions from the Oregon Court of Appeals, although not binding on this Court, support this conclusion.  *See, e.g., Anderson v. Evergreen Int'l Airlines*, 131 Or. App. 726, 734 (1994)(employee's termination for allegedly refusing to violate FAA safety regulations and refusing to participate in the defendant's cover-up of those violations fell within the public-duty or societal-obligation exception); *Banaitis v. Mitsubishi Bank, Ltd.*, 129 Or. App. 371, 380 (1994)(bank employee's termination for refusing to disclose confidential customer financial information constituted a wrongful-discharge claim under the public-duty or societal-obligation exception).

The Court notes Congress has criminalized certain acts of tax evasion.  For example, 26 U.S.C. § 7201 provides:  "Any

14 - OPINION AND ORDER

person who willfully attempts in any manner to evade or defeat any tax imposed by this title . . . shall . . . be guilty of a felony and, upon conviction thereof, shall be fined . . . or imprisoned." Thus, federal law also supports the conclusion that Plaintiff's resistance to illegal tax accounting practices advances a public duty or societal obligation.

In addition, *Dalby v. Sisters of Providence in Oregon*, 125 Or. App. 149 (1993), is particularly pertinent to this case. In *Dalby*, the plaintiff alleged she routinely raised concerns that her employer was not in compliance with Oregon Administrative Rules concerning inventory records for prescription drugs. *Id.* at 151. Rather than comply with the relevant Oregon Administrative Rules, the defendant allegedly retaliated against the plaintiff by making false accusations of theft, fabricating attendance problems, and forcing her to resign. *Id.* at 151-53. The Oregon Court of Appeals, in "light of the public's interest in maintaining adequate control of [prescription drugs], . . . conclude[d] an employee of a pharmacy who makes a good faith report to an employer of noncompliance with the drug inventory and record keeping requirements of [Oregon Administrative Rules] fulfills an important societal obligation." *Id.* at 154.

Here Plaintiff alleges he expressed his concern to Defendants for two years as part of his job responsibilities that

it was necessary to correct what Plaintiff believed in good faith to be illegal tax practices for which willful violation could have exposed Defendant and any other willful violator to criminal sanctions. *Dalby*, therefore, supports Plaintiff's contention that his wrongful-discharge claim falls under the public-duty exception.

Accordingly, on this record, the Court concludes Plaintiff's Claim One for wrongful discharge falls under the public-duty or societal-obligation exception.

**B.   Causal Connection Between a Protected Activity and Plaintiff's Discharge.**

Even if a wrongful-discharge claim is recognized under Oregon common law, an employee must show a causal connection between the protected activity engaged in and the discharge. *Shockey v. City of Portland*, 313 Or. 414, 422 (1992). The Oregon courts define the causal standard as a substantial-factor test that requires an employee to show the protected activity was a "factor that made a difference" in the discharge decision. *Estes v. Lewis and Clark Coll.*, 152 Or. App. 372, 381 (1998), *rev. denied*, 327 Or. 538 (1998)(citing *Holien v. Sears, Roebuck and Co.*, 289 Or. 76, 90 n.5 (1984)). Temporal proximity alone can support a causal inference when there is a short period between the protected activity and the alleged retaliation. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002).

16 - OPINION AND ORDER

Here Defendant argues there is not a causal connection between Plaintiff's complaints about Defendant's tax practices and Plaintiff's termination.  According to Defendant, the actual cause of Plaintiff's dismissal was his angry behavior and loud, violent outbursts rather than his complaints.

According to Plaintiff, however, he was routinely given the impression that he should drop his tax-compliance concerns, quit "beating a dead horse," and stop raising tax-compliance issues even though those issues were integral to his responsibilities as a tax-compliance manager.  Viewed in the light most favorable to Plaintiff, his complaints appear to have been made in good faith. If Plaintiff's estimate of the tax consequences of compliance was correct, the division's bottom line would have suffered a $2.3 million negative adjustment and would have prevented managers from receiving bonuses.  Although he was never told to lie or to forward false information, Plaintiff asserts Carvell asked him not to volunteer information to government auditors about Defendant's tax practices.

As noted, Plaintiff's performance rating dropped in 2004 to "meets" expectations after months of complaining.  In addition, Schmidtmann later listed "trust," among other things, as a reason to deny Plaintiff's request for a raise.  After Plaintiff spoke angrily to Carvell and Schmidt and used harsh language inappropriate to the workplace, Carvell immediately told

Schmidtmann.  Shortly thereafter, Defendant investigated Plaintiff's behavior and terminated him merely two months after June 22, 2005, the date of Plaintiff's final complaint to management regarding Defendant's allegedly illegal tax practices.

In the light most favorable to Plaintiff, there is a sufficient basis for a reasonable juror to conclude Plaintiff's complaints were a "factor that made a difference" in Defendant's decision to terminate him.  *Estes*, 152 Or. App. at 381.  On this record, therefore, the Court finds genuine issues of material fact exist as to whether Defendant terminated Plaintiff at least in part because he repeatedly complained about Defendant's allegedly illegal tax practices.

Accordingly, the Court denies Defendant's Motion for Summary Judgment as to Plaintiff's Claim One for wrongful discharge.

**2.    Claims Two, Three, and Four:  Plaintiff's Family-Leave Retaliation Claims.**

In Claims Two, Three, and Four, Plaintiff alleges Defendant terminated him in retaliation for taking family leave, in violation of Oregon common law, FMLA, and OFLA.

Under FMLA, 29 U.S.C. § 26(a)(1), an employer may not interfere with (*i.e.*, retaliate against) an employee who takes leave protected by FMLA.  *See Bachelder v. Am. West Airlines, Inc.*, 259 F.3d 1112, 1125 (9th Cir. 2001).  The Oregon Court of Appeals also has held an employer may not retaliate against an

employee who takes leave protected by OFLA. *Yeager v. Providence Health Sys. of Or.*, 195 Or. App. 134, 139 (2004).  Whenever possible, OFLA claims are to be construed consistent with similar provisions of FMLA. *See* Or. Rev. Stat. § 659A.186(2).  Here the analysis of FMLA and OFLA is the same.

As a threshold matter, the Court notes Plaintiff cannot state a claim for retaliation unless he can establish a causal connection between the family leave taken and the allegedly retaliatory conduct of Defendant. *See Shockey*, 313 Or. at 422 (wrongful discharge requires a causal connection). *See also Price v. Multnomah Co.*, 132 F. Supp. 2d 1290, 1297 (D. Or. 2001)(court granted summary judgment to the defendant as to the plaintiff's FMLA and OFLA retaliation claims because the evidence did not support a causal inference).

Here Plaintiff contends Defendant terminated him in retaliation for taking family leave to which he was entitled.  As noted, Plaintiff's relationship with Carvell, his immediate supervisor, had deteriorated at the time Plaintiff requested family leave to attend to his ailing mother.  Although Carvell granted Plaintiff the requested family leave, Carvell stressed the department still had a July 1 deadline to complete internal tax documents for outside auditors and directed Plaintiff to do all in his power to meet that deadline.  Plaintiff's department, however, missed the deadline partly due to Plaintiff's absence on

19 - OPINION AND ORDER

family leave.  Plaintiff asserts Carvell was upset because
meeting this deadline was a benchmark for Carvell's bonus.

As noted, Defendant contends it terminated Plaintiff
following an investigation into Plaintiff's angry behavior and
use of inappropriate and disparaging language toward management
after he was denied a raise.  Even though Carvell granted
Plaintiff's family-leave request and might have been upset with
Plaintiff over missing the July 1 deadline and jeopardizing
Carvell's bonus, the record does not reflect that Carvell was a
decision-maker or that he participated materially in the
termination decision.  Plaintiff also has not produced any
evidence to show that the parties who ultimately made the
termination decision (Schmidtmann, Cuniff, and Cromwell) even
knew Plaintiff had taken family leave.  In fact, because
Plaintiff did not use any family-leave flex-time hours, Defendant
did not even possess any "official" record of Plaintiff's family
leave.

Thus, on this record, any causal connection between
Plaintiff's exercise of his right to family leave and his
termination is speculation at best.  Plaintiff, therefore, has
not met his threshold burden.

Accordingly, the Court grants Defendant's Motion for Summary
Judgment as to Plaintiff's Claims Two, Three, and Four.

20 - OPINION AND ORDER

## CONCLUSION

For these reasons, the Court **DENIES** Defendants' Motion for Summary Judgment (#43) as to Plaintiff's Claim One and **GRANTS** Defendant's Motion as to Plaintiff's Claims Two, Three, and Four.

IT IS SO ORDERED.

DATED this 15th day of November, 2006.

/s/ Anna J. Brown
_____
ANNA J. BROWN
United States District Judge

21 - OPINION AND ORDER